a note signed Krueger, Loud & Co., with the defendant's authority. As between the parties, it means only Loud & Bailey; but when third persons take it in good faith, believing that it binds the three persons who are apparently bound by it, they must be bound [unless the party had actual knowledge that the firm name expressed something different from its purport, and this, upon the familiar principle that the retiring partner has enabled his former associates to mislead an innocent third person, and a mere constructive notice does not take a case out of this first rule.] [2]

---

## Case No. 7,942.

### In re KRUEGER et al.

### Ex parte BUGBEE.

[2 Lowell, 182.] [1]

District Court, D. Massachusetts. Oct., 1872.

BANKRUPTCY—EXAMINATION—PRIVILEGES—LETTERS.

1. Section 26 of the bankrupt act [of 1867 (14 Stat. 529)] authorizes the examination of the bankrupt and of any one who is believed to have important information touching the estate, trade, or dealings of the bankrupt, which may aid the assignee in the execution of his trust.

2. It seems that the bankrupt, since the passage of the act of 25th February, 1868 (15 Stat. 37), could not refuse to testify on the ground that his answers might criminate him in the federal courts; but the privilege of communication between client and solicitor or counsel extends to bankrupts and their legal advisers.

3. A person who is examined under section 26 is to disclose all matters touching the trade, &c., of the bankrupt; but is entitled to the usual privileges and exemptions.

4. Letters written by one partner to another concerning a lawsuit, which the partners expect to begin, and do presently after begin, are privileged.

5. So are letters which concern only the case of the party writing the letters, and have no relation to the title or position in the litigation of the interrogating party.

[In the matter of Krueger, Loud & Co., and ex parte Bugbee, bankrupts.]

LOWELL, District Judge. That part of section 26 which relates to the examination of witnesses is very brief, and might seem to be intended only to give the bankrupt court power to obtain evidence in actual trials pending before it. But when it was considered that the first section of the statute had already conferred this power by necessary implication in establishing the court and defining its general powers and jurisdiction, and when the subject-matter of the section was seen to be an examination into the trade and dealings, &c., of the bankrupt, the courts have uniformly arrived at the conclusion, that a general examination, without any definite suit or issue pending, was intended to be included. In re Blake [Case No. 1,492]; In re Feinburg [Id. 4,716]; In re Fay [Id. 4,708]; In re Lathrop [Id. 8,106]. It will be found that systems of bankruptcy have usually made provision for such investigations. Thus, the act of 5 Geo. II. c. 30, § 16, passed in 1732, was remarkably like our section 26. It provided that the commissioners might examine, as well by word of mouth as by interrogatories, every bankrupt, touching all matters relating to his trade, dealings, estate, and effects; and might also "examine, in manner aforesaid, all and every other person duly summoned before, or present at, any meeting of the said commissioners, or the major part of them, touching all matters relating to the trade, dealings, estate, and effects of every such bankrupt." In 1 Christian, Bankr. Law (2d Ed.) 375, the learned writer says of these examinations: "The object in general is to compel a discovery by a confession of the party, which in every court will be evidence against himself." In later statutes, the power has generally been defined somewhat differently; but the main object and use of it have been similar. Thus the statute of Massachusetts, 1846, c. 168, § 1 (now codified in Gen. St. c. 118, § 107), and like statutes in England, authorize the courts of bankruptcy and insolvency to summon and examine persons suspected of having property of the bankrupt. In deciding a case upon the statute of 1846, Shaw, C. J., uses almost identical language with that I have quoted from Mr. Christian: "The purpose of the statute seems to be, by a thorough investigation of the case and an appeal to the conscience of the party suspected, to enable the assignees to judge whether they will proceed to claim such property for the general creditors, and to obtain evidence to aid them in prosecuting such claim." Harlow v. Tufts, 4 Cush. 448, 453. This being the purpose of the law, I have thought proper, as matter of practice, in order to guard against vexatious and oppressive examinations, to require a brief statement to be made on oath by the assignee or creditor applying for the summons, showing the subject-matter upon which he wishes to examine, and some ground to believe that the witness has information which would benefit the general creditors. It is not necessary that the witness should be himself suspected of having any estate or effects of the bankrupt, because our statute is not limited to that; but most witnesses

---

[2] [From 5 N. B. R. 439.]

[1] [Reported by Hon. John Lowell, LL. D., District Judge, and here reprinted by permission.]

will be found to be persons so suspected, or persons in complicity with them, because the examination is of no value as evidence, excepting against the witnesses themselves.

These examinations, then, stand in effect on the footing of summary bills of discovery; and. in my opinion, they should be subject to those rules of evidence which the courts have found to be just and necessary in cases of discovery in equity, and at law when courts of law have equity powers; and I have consulted the decisions in that class of cases as well as those in bankruptcy. The discovery cannot be limited by reference to an action pending, for there is no such limitation in the law; but it is to be confined to the subject-matter, the trade, dealings, estate, of the bankrupt. Ex parte Legge, 17 Jur. 415, per Coleridge, J. The right of the assignees. then, as I consider it, extends to a discovery of all such matters as may throw light upon the estate of the bankrupt, including the debts owed him and conveyances and payments made by him, which are supposed to be voidable by his assignees whether on the ground of preference or any other.

In the examination of witnesses or parties, whether in the way of discovery or otherwise, there are certain questions which they may refuse to answer; the two principal grounds of demurrer being that the answer may tend to criminate the witness, and that the conversation or document called for is privileged. The former objection is perhaps no longer available to bankrupts, so far as relates to crimes against the bankrupt law or other crimes cognizable by the federal courts, since the statute of Feb. 25, 1868 (15 Stat. 37), which was probably intended to meet their case, and which provides that no answer or other pleading, and no discovery or evidence obtained by means of any judicial proceeding, shall be given in evidence, or used in any manner against the party or witness, or his property or estate, in any criminal or penal proceeding in the courts of the United States. But the objection that the communication is privileged is the one which this case raises.

The right which every person, whatever his character or standing, has to consult freely with his legal adviser, is one which, where criminal trials are concerned. it is not too much to call a sacred one; and in civil matters it is a most important right, without which the usefulness of the solicitor and advocate must be seriously diminished. So far from curtailing this privilege, I believe the law would do well to extend it to some other professional persons. It has been ruled that the solicitor of a bankrupt is an exception; because the privilege being that of the client, and the bankrupt being bound to disclose every thing, the solicitor must do likewise. In re Elliott, Fonbl. Bankr. Cas. 74. This ruling appears to me to be founded on a misapprehension. Undoubtedly, a bankrupt is bound to disclose the whole truth concerning his property, dealings, &c., and to surrender all his books, contracts, &c., to his assignee; equally true is it that every witness, whether a party in interest or not is bound to disclose the whole truth concerning the matter under inquiry: but the whole truth does not include confidential communications between client and solicitor, or client and counsel, which are admissions made under the seal of authorized secrecy.

In this case it appears that the bankrupts, in February, 1871, made an executory contract with the witness and his partner, composing the firm of Holt & Co., to sell them certain timber, to be delivered at the bankrupts' mill in the state of Illinois. About the time the bankrupts stopped payment, a shipment of timber was made from the mill to the port of Boston: and this timber was taken by Skillings & Co., as belonging to them by virtue of some pledge from the bankrupts; but the witness and his partner considered that it belonged to them, and took it from Skillings & Co., by a writ of replevin; and the suit is still pending in the courts of the state. I understand that, if Holt & Co. prevail in that suit, the assignees intend to claim the timber as assets of the bankrupts: and that, besides. they are interested in favor of the title of Skillings & Co., because there will be a balance left for the general creditors, after the pledge has been redeemed from them; whereas, if Holt & Co.'s title is good, it takes the whole. Under these circumstances, it is proper that the assignees should examine the witness concerning the delivery of the timber; and the only remaining question is. whether the letters, all of which are written by one partner to his co-partner, are privileged. It seems that Holt was at the mill of the bankrupts in Illinois when the replevin suit was brought; and the other partner, the present witness, swears he was there to obtain evidence in support of their claim, that the timber had been fully delivered to them under the terms of the contract. By consent of counsel I have looked at the letters; and two of them. dated respectively June 20 and 22, 1871. are clearly within the privilege, because they are narratives of interviews between the witness and his legal advisers. The other letters, which are statements, advice, &c., from one partner to the other, in relation to the dispute between them and Skillings, present a question of some difficulty, upon which the decisions cannot be fully reconciled. In Kerr, Disc. pp. 144, 146, the cases are referred to; and the discrepancy in them is well illustrated by the inconsistent statements of the learned author, who, following faithfully the decisions, says on page 144: "No privilege attaches to communications, however confidential they may be, passing between a party and his agent, even after the dispute may have arisen, and in contemplation of litigation. unless they have been made to the agent, either by the

party, for the purpose of being communicated to his legal adviser in his professional capacity, or by the legal adviser, for the purpose of being communicated to the party." And on page 145: "Communications, however, with an unprofessional lay agent, in anticipation of litigation, and with a view to the prosecution of a claim or a defence to a claim, are protected from production. Information procured through an agent relative to litigation, and with a view to it, is as much protected on principle as if it were procured through a solicitor; for it is in reality the litigant party who conducts the litigation, though he conducts it through a solicitor." Here we find a most distinct announcement, in the first quotation, that communications are not protected, unless they come through the solicitor; and in the other, one fully as explicit that the interposition of the solicitor is of no consequence. I suppose the learned author did not feel called upon to reconcile this conflict, or to do more than reflect the light thrown on his subject by the cases cited, however its color might vary at different moments. It seems to me, however, that the doctrine of page 145 is the true one, besides conforming to the latest cases. See Gibbs v. Ross, L. R. 8 Eq. 522; Cossey v. London, B. & S. C. Ry. Co., L. R. 5 C. P. 146; Chartered Bank of India v. Rich, 4 Best & S. 73. This is a sound application of the rule, that the privilege of the solicitor rests on that of his client. I have no fault to find with those cases which require the production of reports of agents, made in the ordinary course of their duty, before litigation, and which, therefore, stand like res gestae. Woolley v. North London Ry. Co., L. R. 4 C. P. 602; Mahony v. Nat. Widows' Life Assur. Fund, L. R. 6 C. P. 252. But when a lawsuit is begun, or is imminent, the parties to it ought to be at liberty to consult with each other, and with agents, without the necessity of producing the correspondence, at the call of the opposing party.

There is another sufficient ground for excluding these letters, that they relate to the case of Holt & Co., exclusively. It has always been the rule in equity, and has been adopted at common law in England and Massachusetts, that all which any party to the litigation is bound to discover is what relates to his opponent's case. Thus the cases in which the reports of agents have been required to be disclosed were reports of interviews with the party interrogating, or of the facts attending the injury to him, and matters tending to establish his side of the controversy. But these letters were written concerning the witness's own case exclusively, and have no reference to the title or evidence of Skillings & Co. They might possibly tend, if produced, to show defects in the witness's case, but none to show any strength in that of his opponent. For both these reasons, I decide that the witness is not bound to produce these letters for inspection by the assignees.

Order accordingly.